UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

THE GREAT ATLANTIC & PACIFIC TEA
COMPANY, INC.,

                              Debtor,
------------------------------------------------------------X
MBB REALTY LIMITED PARTNERSHIP,

                              Appellant,

        -v-

THE GREAT ATLANTIC & PACIFIC TEA
COMPANY, INC.,

                              Appellee.

Case No. 13-CV-03639 (KMK)

OPINION AND ORDER

Appearances:

Jeffrey Meyers, Esq.
Sarah Schindler-Williams, Esq.
Ballard Spahr LLP
Philadelphia, PA
*Counsel for Debtor-Appellee*

Patrick J. Troy, Esq.
Sirlin, Lesser & Benson, PC
Philadelphia, PA
*Counsel for Appellant*

KENNETH M. KARAS, District Judge:

Appellant MBB Realty Limited Partnership ("MBB") appeals from a final Order of the

United States Bankruptcy Court for the Southern District of New York ("the Bankruptcy Court")

dated April 5, 2013, in which the Bankruptcy Court denied summary judgment for MBB, but

granted summary judgment for Debtor-Appellee The Great Atlantic & Pacific Tea Company,

Inc. ("A&P"). For the reasons given herein, the judgment of the Bankruptcy Court is affirmed.

## I.  Background

### A.  Factual Background

On September 3, 1999, MBB and Super Fresh Food Markets, Inc. ("Super Fresh"),

signed a commercial lease ("the Lease") for property located on Frankford Avenue in the 57th

Ward of Philadelphia, Pennsylvania ("the Demised Premises").  (*See* Appellant's Designation of

Items To Be Included in the R. on Appeal, Item No. 10, Joint Exs. 1–56 in Supp. of Cross-Mots.

for Summ. J. ("Joint Exs."), Lease By and Between MBB and Super Fresh, Sept. 3, 1999 ("Ex.

9"), at 1, 43, 46.)  Super Fresh is a wholly owned subsidiary of A&P.  (*See* Joint Exs., Janet

Sides Dep. Tr., Nov. 16, 2010 ("Ex. 2") 8:11–15.)  Nine days earlier, on August 25, 1999, "in

order to induce" MBB into signing the Lease, A&P had guaranteed "the due and punctual

payment and performance by [Super Fresh] of all of its [lease] obligations."  (Joint Exs.,

Guaranty of MBB, Sept. 3, 1999 ("Ex. 10"), at 1.)  For the sake of convenience, the Court will

refer to Super Fresh and A&P jointly as "A&P" throughout this Opinion.

Article 7(B)(iii) of the Lease obligated A&P to "diligently pursue the construction of a

building . . . on the Demised Premises . . . which building shall contain approximately [55,853]

square feet of ground floor area . . . ."  (Joint Exs., Ex. 9, at 11.)  Under Article 6(A), A&P

"agree[d] to open the Demised Premises for business as a fully stocked and operational

supermarket," although "subsequent to [A&P's] opening [as such], [A&P] [was not] obligated to

conduct or to remain open for the conduct of any business . . . ."  (*Id*. at 6.)  The Demised

Premises were to be "used and occupied only for the operation of a supermarket, drugstore,

automated teller machine, bank and/or for any other lawful retail or service purpose or purposes

or for any office or warehouse use incidental to a permitted use . . . ."  (*Id*. at 5–6.)

2

Article 20 covered assignment and subletting, and stated that, "[p]rovided that the use does not violate the terms and provisions of Article 6 hereinabove, [A&P] may sublet all or any part of the Demised Premises, or license the use of any portion thereof or assign this Lease, but [A&P] shall nevertheless continue to remain liable hereunder." (*Id*. at 25.)

Titled "Alterations," Article 15 read in relevant part as follows:

The Tenant may at its own expense from time to time, during the term hereof, make such alterations, additions, improvements and changes, structural or otherwise . . . in and to the Demised Premises which it may deem necessary or desirable, provided such alterations shall not increase or decrease the footprint nor impair the structural integrity of the Demised Premises; provided, however, that in the event the Tenant wishes to make an Alteration to the exterior of Tenant's building (other than to sign faces) Tenant shall first obtain Landlord's consent thereto, which consent shall not be unreasonably withheld, conditioned or delayed.

(*Id*. at 23.)

Under Articles 3(A) and 5, the lease term was to run for 20 years, during which time the fixed annual rent that Tenant would owe Landlord would be $800,250 for years one–ten, $855,250 for years 11–15, and $910,250 for years 16–20. (*See id*. at 3, 4.) Article 35 mandated that the rights and obligations of the Parties under the Lease were to be interpreted and construed in accordance with Pennsylvania law, while Article 50 provided that, "[i]n any event of any ambiguity, controversy, dispute or disagreement over the interpretation, validity or enforceability of this Lease or any of its covenants, terms or conditions, no inference, presumption or conclusion whatsoever shall be drawn against Tenant by virtue of Tenant's having drafted this Lease." (*Id*. at 40.)

Article 39 contained an integration clause, and also laid out the process by which the Parties could alter the Lease:

This Lease contains the entire agreement between the parties and cannot be changed, modified or amended unless such change, modification or amendment is in writing

3

and executed by the party against which the enforcement of the change, modification or amendment is sought. Any document, notice or consent including, without limitation, this Lease, any amendment thereto or extensions thereof or any notice given under Article 7 shall only be binding upon Tenant if executed by a corporate officer duly authorized to do so or by such other party authorized in writing by the Board of Directors of Tenant to execute documents on behalf of Tenant. Any such notice, document or extension not so executed may be ratified by Tenant.

(*Id*. at 36.)

The Parties altered the Lease a number of times. On June 11, 2002, at least in part in an effort to resolve "litigation concerning disputes over the Lease" pending in the Pennsylvania Court of Common Pleas, the Parties executed the "Fourth Amendment to Lease Agreement" ("the Fourth Amendment"). (Joint Exs., Fourth Amendment to Lease Agreement, June 11, 2002 ("Ex. 13"), at 1, 9–12.) The Fourth Amendment modified the Lease in a number of ways, the most important of which were the following:

1) The Fourth Amendment's Article 5(C)(iii) replaced the Lease's Article 7(B)(iii), downsizing the building Tenant was required to "diligently pursue the construction of" from 55,853 to 48,131 square feet of ground-floor area. (*Id*. at 6.)

2) The Fourth Amendment's Article 4 replaced the Lease's Article 6(A), such that the Lease's provision regarding use and occupancy thereafter read as follows:

The Demised Premises may be used and occupied only for the operation of a supermarket, drugstore, automated teller machine, bank and/or for any other lawful retail or service purpose or purposes or for any office or warehouse use incidental to a permitted use, unless restricted pursuant to the Cross Easements as set forth in Exhibit 'I'. Tenant agrees to open the Demised Premises for business as a fully stocked and operational supermarket within one (1) year following the date of the Fourth Amendment to the Lease Agreement. Notwithstanding anything to the contrary contained in this Lease, subsequent to Tenant's opening of the Demised Premises for business as a fully stocked and operational supermarket, Tenant shall not be obligated to conduct or to remain open for the conduct of any business in the Demised Premises, but Tenant may, in its sole discretion, elect to operate up to and including twenty-four (24) hours a day. (*Id*. at 4.)

4

3)  The Fourth Amendment's Article 3 also replaced the Lease's Article 5, lowering the

fixed annual rent Tenant owed Landlord for years one–ten from $800,250 to $663,223.61; for

years 11–15 from $855,250 to $718,223.61; and for years 16–20 from $910,250 to $773,223.61.

(*See id*. at 3.)

4)  The Fourth Amendment's Exhibit L introduced "percentage payments" into the

agreement for the first time.  According to Exhibit L:

> [I]n addition to fixed annual rent, Tenant shall make annually, as an additional
> Charge, a percentage of sales payment . . . in an amount equal to [2.5%] . . . of all
> Sales . . . in excess of the Sales Base . . . made by Tenant in and from the Demised
> Premises for each Lease Year. (Ex. 13, at Ex. L.)

Exhibit L defined the Sales Base as $22,100,000 for the Lease's first twenty years, and

also contained the following disclaimer:

> Tenant makes no representation or warranty that the business in the Demised
> Premises will amount to any specified volume.  Except as specifically provided in
> the Lease, nothing herein contained shall be deemed to require that the Demised
> Premises be opened or remain open for any business.  Landlord and Tenant agree
> that Tenant has no fiduciary relationship with Landlord and Landlord shall not
> hereby acquire any interest in Tenant's business.

(*Id*. at Ex. L.)

When A&P signed the Fourth Amendment in 2002, it expected to open a "Superfresh"

store in the building that it had contracted to construct.  (*See* Joint Exs., Timothy Huttleston Dep.

Tr., Dec. 8, 2010 ("Ex. 4") 18:6–9.)  However, by the summer of 2006, A&P instead had decided

to open a smaller "Food Basics" store in the building.  (*See id*. at 18:6–9.)  In furtherance of this

objective, A&P planned to erect a demising wall separating the Food Basics store from

approximately 9,000–11,000 square feet in the building that the store would not require for its

operation.  (*See id*. at 22:22–24, 23:1–5; Joint Exs., Michael Willner Dep. Tr., Oct. 20, 2011

5

("Ex. 5") 85:4–24, 86:1–24, 87:1.)   A&P's "ultimate intention" was to sublease this excess floor space to subtenants.   (Joint Exs., Ex. 4, at 24:8–13; *see also* Joint Exs., Ex. 5, at 85:1–13.)

Once A&P had settled on this course of action, it "put together a design and a budget" and moved forward with its downsizing plan, at which point the contractor that A&P had hired "went to the City of Philadelphia to get . . . approval for [building] permits," and was told that "a zoning application . . . needed to be applied for first before permits were issued and that the landlord would have to sign that application."  (Joint Exs., John Majczan Dep. Tr., Nov. 18, 2010 ("Ex. 3") 122:10–24; *see also* Joint Exs., Memorandum from Janet Sides, June 19, 2009, with E-Mails Among Timothy Huttleston, Janet Sides, and John Majczan, July 19–20, 2009 ("Ex. 31").)  Accordingly, A&P contacted Michael Willner ("Willner"), president of MBB's general partner, in order to secure "a letter to the city for A&P's permit to downsize the store," which initiated a series of communications at the core of the instant dispute.  (Joint Exs., Ex. 5, at 83:4–8.)

On June 21, 2006, Janet Sides ("Sides"), A&P's real estate manager, emailed Willner with a "self-explanatory [letter] for [his] signature concerning the permit process for [the Demised Premises]."  (Joint Exs., E-mail Chain Between John Majczan, Timothy Huttleston, Michael Willner, Janet Sides, and David Pope, June 21, 2006 ("Ex. 16").)  She informed Willner that he would also be receiving further correspondence from A&P's corporate-construction department, which would consist of "sign changes that need[ed] [his] approval for both the front of the building and the pylons."  (*Id*.)  Willner responded to Sides by email on the same day, noting that he was in receipt of her correspondence as well as correspondence from corporate construction.  (*Id*.)  He wrote that he would be "happy" to work with Sides to "make some

6

changes" to the Demised Premises, but that "[p]rior to approving [her] changes," he had

"concerns" that he wanted to discuss, which included the following:

> 1. The zoning approval for the site provides approval for a supermarket and a certain number of other retail stores (I think 5). Prior to dividing your space, you need to obtain zoning approval for more retail uses at the site. I think we should obtain approval for up to 10 stores at the site, excluding the Hollywood Video building.

> 2. When we renegotiated the Lease when you originally downsized the store, percentage rent was a big part of the negotiations. By downsizing again, you are damaging my chances of receiving percentage rent. We need to discuss this issue . . . .

> 4. In terms of your new signs, I recommend that we obtain approval for an additional box for signs on the pylon on Academy Road. We should obtain an additional box with at least 6 panels. You can utilize a panel for the tenant you obtain for the 9000 sf space. Any potential new tenant will desire a pylon panel.

> 5. Lastly, I am concerned about the quality of the tenant going in the 9000 sf space. I have spent a lot of effort trying to keep the center occupied by 1st class tenants. I am not interested in a local dollar store. Additionally, I believe that a dollar store will hurt your sales and cost me more $ in % rent."

(*Id*.)

On July 12, 2006, Sides sent Willner a letter from John Majczan ("Majczan"), A&P's

director of real estate development, which Majczan described as a "follow up to our recent meeting,

emails and telephone conversations regarding A&P/Food Basics desire to erect a demising wall in

order to allow the downsizing of the sales area" at the Demised Premises. (Joint Exs., E-Mail from

Janet Sides to Michael Willner, July 12, 2006, with Attached Letter from John Majczan to Michael

Willner, July 12, 2006 ("Ex. 27").) In his letter, Majczan proposed "an outline of modifications to

the Lease addressing [Willner's] concerns which [Majczan] would be willing to submit to Corporate

for approval . . . ." (*Id*.) Regarding modifications to the Lease's percentage-rent provisions,

Majczan proposed 1% of annual sales over a sales base of $18,000,000, 1.5% over $19,000,000, and

2% over $20,000,000, as well as retention of the original 2.5% over $22,100,000 that the Fourth

Amendment had set approximately four years earlier.  (*See id*.)  The primary effect of Majczan's proposed modifications in this regard would thus have been to lower the amount of money in annual sales that A&P would have had to generate from the Demised Premises in order to trigger MBB's entitlement to a percentage of those sales.

Regarding "the quality of tenants occupying the space available after the modifications were complete," Majczan offered to have A&P pay rent on the space for six months, after which time A&P would pay MBB $100,000 and MBB would "take the space back."  (*Id*.)  However, if MBB was "not receptive" to that approach, Majczan proposed that A&P "would have the right to sublease to any use allowable under the Lease, however, [A&P] would not sublease to a Dollar Store plus agree to sublease to a regional or national tenant."  (*Id*.)

"Addressing [Willner's] other concerns," Majczan wrote that A&P would also "go to the City of Philadelphia for a zoning application and . . . use good faith efforts to attempt to obtain approval for additional retail spaces as outlined in [Willner's] June 21, 2006 email."  (*Id*.) Further, A&P would "apply through zoning and attempt to obtain an additional tenant box for signs on the pylon . . . for at least [six] panels or an amount to be clarified and . . . use commercially reasonable efforts to obtain the same."  (*Id*.)  Majczan noted that "timing [was] of the essence to perform the construction work and have the Grand Re-opening prior to a competitor opening so that [A&P's] customers [could] become acclimated to the new format," and requested that Willner execute the letter "so that a representative of [A&P] [could] go to the City of Philadelphia to apply for a zoning application that [was] needed before a building permit [could] be issued."  (*Id*.)  In the letter's final paragraph, Majczan wrote that the letter would "not be binding until an executed letter [was] submitted to [A&P's] Corporate Executive

8

Management Committee for final approval and full execution of any necessary legal documents by all parties." (*Id*.)

Willner emailed back the next day with what was essentially a counteroffer. As to percentage rent, he wrote:

> The original lease call[ed] for percentage rent (2.5%) to kick in if sales are greater than $459.16 [per square foot]. Based on this number, the new % rent breakpoint for the smaller store (37,031 [square feet]) should be $17,003,153. In an attempt to compromise, I will agree to:
>     a. 2% over $17 million, and
>     b. 3% over $20 million.

(Joint Exs., E-Mail from Michael Willner to Janet Sides, July 12–13, 2006 ("Ex. 17").)

As to "the quality of tenant occupying space available," Willner communicated that he was "not interested in recapturing any space" at the time, although he did "appreciate [A&P] not leasing to a dollar store or any tenant that competes with the existing tenants of the shopping center." (*Id*.) He also wrote that he was "agreeable to [A&P] using *best* efforts to obtain approval for the additional retail spaces and tenant boxes for the . . . pylon simultaneously with the remodel." (*Id*.)

Several internal communications between Majczan, Sides, and A&P senior director of real estate Timothy Huttleston followed. On July 13, 2006, in response to Willner's counteroffer email from earlier that day, Sides wrote to Majczan that Willner was "not being very reasonable . . . ." (Joint Exs., E-Mail Chain Between Janet Sides, John Majczan, and Michael Willner, July 12–13, 2006 ("Ex. 28").) On July 17–18, 2006, Majczan and Huttleston discussed efforts to craft a counteroffer of their own, according to which A&P would propose new percentage-rent terms of 1.5% of annual sales over a sales base of $17,000,000, 2% over $20,000,000, and 2.75% over $22,000,000. (*See* Joint Exs., E-Mail Chain Between John

Majczan and Timothy Huttleston, July 17, 2006 ("Ex. 18").)  On July 19, 2006, Sides wrote to

Willner that upon receipt of his July 13 email, she had forwarded a copy of it to Majczan, who in

turn "had discussions with Corporate concerning [Willner's] proposal as it relate[d] to

percentage rent."  (Joint Exs., E-Mail Chain Between Michael Willner, Janet Sides, and John

Majczan, July 12–13, 19, 2006 ("Ex. 29").)  She then reproduced the proposed percentage rent

terms that Majczan and Huttleston had discussed internally the day before—1.5% over

$17,000,000, 2% over $20,000,000, and 2.75% over $22,000,000—which she described as a

"modified structure and one that [she] believe[d] Corporate [would] agree to . . . ."  (*Id*.)  She

also informed Willner that, "as [she] was typing [the] e-mail, [Majczan] [had] called [her] and

said that [he and Willner had] spoke[n] briefly."  (*Id*.)  On July 20, 2006, Willner emailed Sides

and Majczan, suggesting that the Parties "compromise at . . . [1.5%] over $17 million . . . 2%

over $18.5 million . . . 2.5% over $20 million . . . [and] 3% over $21.5 million."  (Joint Exs., E-

mail Chain Between Michael Willner, Janet Sides, and John Majczan, July 13, 19–20, 2006

("Ex. 30").)

     Five days later, on July 25, 2006, Majczan sent Willner an updated version of his original

July 12 letter.  (Joint Exs., Letter Agreement Between John Majczan and Michael Willner, July

25, 2006 ("Ex. 15").)  The former was identical to the latter in all but two respects.  First, in

regard to percentage rent, Majczan's "new proposal" was 1.5% of annual sales over a sales base

of $17,000,000, 2% over $18,500,000, 2.5% over $20,000,000, and 2.75% over $21,500,000.

(*Id*.)  Second, in regard to "the quality of tenants occupying the space available after the

modifications are complete," Majczan dropped A&P's earlier offer for MBB to reclaim the

space, writing only that "[A&P] would have the right to sublease to any use allowable under the

Lease, however, [A&P] would not sublease to a Dollar Store plus agree to a regional or national

tenant." (*Id*.)  The July 25 letter also contained the same disclaimer as did the July 12

letter—that it would not be binding until submitted to A&P's Corporate Executive Management

Committee for final approval and full execution of any necessary legal documents.  (*See id*.)

Willner signed the letter on July 28, 2006.  (*See id*.)

      Approximately one-and-a-half-years later, on January 24, 2008, A&P sent MBB its

calculation of the amount that it owed MBB in percentage rent for the lease year that had ended

on July 31, 2007, which it calculated pursuant to the following percentage rent terms: 1% of

annual sales over a sales base of $17,000,000, 2% over $18,500,000, and 2.5% over

$20,000,000.  (Joint Exs., Correspondence Between Liliana Martinez and Michael Willner, Dec.

12, 18, 2008 ("Ex. 21").)  Based on A&P's self-reported gross sales of $20,316,966, the total

amount that it claimed it owed MBB in percentage rent stood at $52,924.  (*See id*.)  On February

1, 2008, MBB "disagree[d] with [A&P's] calculations" by way of letter, pointing out that,

"[p]ursuant to the July 25, 2006 letter agreement," a copy of which MBB enclosed, "the percent

rent clause changed."  (*Id*.)  MBB asserted that instead of 1% of annual sales over a sales base of

$17,000,000, it was entitled to 1.5% over $17,000,000, which would increase the total amount it

was owed from $52,924 to $60,424.15.  (*Id*.)  On February 6, 2008, A&P paid MBB the

difference between A&P's initial and MBB's subsequent calculations, in the amount of

$7,500.15.  (*Id*.)

      However, approximately ten months after that, on December 12, 2008, A&P wrote to

MBB that "[a] review of [its] occupancy costs disbursements indicate[d] that [MBB] was

overpaid for Percentage Rent for the year 2007 in the amount of $60,424.15," and that the

payment had been made "erroneously based on a non-binding letter."  (*Id*.)  "As such, the Lease

ha[d] not been amended and therefore the percentage sales clause remain[ed] the same [as that

contained in the Fourth Amendment]."  (*Id.*)  A&P advised MBB that "the overpayment [would] be reimbursed by deducting the percent rent owed commencing with 2008 and continuing until $60,424.15 ha[d] been reimbursed."  (*Id.*)  Deducting the percentage rent that A&P claimed it owed MBB for the lease year ending July 31, 2008, A&P determined that MBB owed A&P $28,995.51.  (*See* Joint Exs., Correspondence From Liliana Martinez and Michael Willner, Dec. 12, 2008 ("Ex. 22").)

Willner responded on behalf of MBB six days later.  He wrote that he was "extremely disappointed in the lack of good faith exhibited by [A&P]," citing the Fourth Amendment's lowering of the base rent and creation of the percentage-rent terms, the correspondence leading up to and execution of the July 25, 2006 letter agreement, the fact that "[A&P] went forward with the downsizing of the store pursuant to the letter agreement," and the fact that on February 6, 2008, A&P had "confirmed [MBB's] calculation and made payment to [MBB] in the appropriate amount" for the lease year ending July 31, 2007.  (Joint Exs., Ex. 21.)  Willner also stated that it was "clear that [A&P's] conduct over the past two and one-half years ratified the letter agreement," and asked that if A&P did not agree with his analysis, to "please contact [him] immediately so that [MBB] [could] pursue its available rights and remedies."  (*Id.*)

On March 24, 2009, Willner offered to "reduce the percentage rent due for last year and settle this matter," provided that the Parties had "an acknowledgement [sic] that going forward [the July 25, 2006] letter agreement is valid and binding."  (Joint Exs., E-mail from Michael Willner to Robert Volosin, Apr. 7, 2009 ("Ex. 23").)  But he warned that, if they could not settle the matter, MBB would "unfortunately . . . be forced to take legal action."  (*Id.*)  Take legal action it did, filing a complaint in the Philadelphia County Court of Common Pleas on December 23, 2009, in which it sought unpaid percentage rent calculated pursuant to the July 25, 2006

letter agreement and an order directing A&P to pay future percentage rent according to its terms.
(Joint Exs., Verified Compl., Dec. 23, 2009 ("Ex. 6").)  A&P answered and counterclaimed on
February 19, 2010, and MBB replied on October 19, 2011.  (Joint Exs., Verified Answer with
New Matter and Counterclaim, Feb. 19, 2010 ("Ex. 7"); Verified Reply to New Matter and
Answer to Counterclaim, Oct. 9, 2011 ("Ex. 8").)

    B.  Procedural History

       On December 12, 2010, A&P filed a voluntary petition for Chapter 11 bankruptcy in the
Bankruptcy Court.  (Voluntary Petition (Dkt. No. 1), *In re the Great Atlantic & Pacific Tea
Company, Inc., et al.*, Bankr. Pet. No. 10-24549 (Bankr. S.D.N.Y. Dec. 12, 2010).)[1]  On July 8,
2011, the bankruptcy court granted A&P's motion to assume the Lease and pay related cure
costs pursuant to 11 U.S.C. §§ 363 and 365, with the cure amount stated as $9,482.73.  (Order
(Dkt. No. 2181), *In re the Great Atlantic & Pacific Tea Company* (July 8, 2011).)
Unsurprisingly, given the complaint that MBB had filed in the Court of Common Pleas
approximately six months earlier, the Parties disputed the cure amount—"MBB . . . contend[ed]
that the cure costs [were] about $600,000.00 through the lease year ending July 31, 2011, while
[A&P] contend[ed] that the cure costs [were] substantially less."  (Stipulation and Order (Dkt.
No. 3923), *In re the Great Atlantic & Pacific Tea Company* (Aug. 16, 2012).)

       The Parties proposed and the Bankruptcy Court signed orders permitting them to submit
cross-motions for summary judgment on their cure objections, which they filed on September

---

[1] Hereinafter, documents from the underlying bankruptcy proceeding will be cited as
"[Document Name] ([Docket Number]), *In re the Great Atlantic & Pacific Tea Company*
([Document Date])" the first time the document is cited, and by the document name in
subsequent citations.

21, 2012, and responses thereto, which they filed on October 22, 2012.  (Stipulation and Order (Dkt. No. 3923), *In re the Great Atlantic & Pacific Tea Company* (Aug. 16, 2012); Debtor's Mot. for Summ. J. (Dkt. No. 3978), *In re the Great Atlantic & Pacific Tea Company* (Sept. 21, 2012); MBB's Mot. for Summ. J. (Dkt. No. 3979), *In re the Great Atlantic & Pacific Tea Company* (Sept. 21, 2012); Joint Exs. 1–56 in Supp. of Cross-Mots. for Summ. J. (Dkt. No. 3980), *In re the Great Atlantic & Pacific Tea Company* (Sept. 21, 2012); MBB's Supporting Mem. L (Dkt. No. 3981), *In re the Great Atlantic & Pacific Tea Company* (Sept. 21, 2012); MBB's Opp'n to Debtor's Mot. for Summ. J. (Dkt. No. 4011), *In re the Great Atlantic & Pacific Tea Company* (Oct. 22, 2012).)  On February 4, 2013, the Bankruptcy Court held oral argument on the Parties' motions.  (Hr'g Tr. (Dkt. No. 4143),  *In re the Great Atlantic & Pacific Tea Company* (Feb. 4, 2013).)

At the conclusion of oral argument, the Bankruptcy Court issued a Preliminary Ruling, in which it denied MBB's and granted A&P's summary judgment motion.  The Bankruptcy Court found that A&P had "essentially ma[de] two arguments in support of its contention that it does not owe the cure claim for percentage rent."  (*Id*. at 64–65.)  The first was that the July 25, 2006 letter "is not a binding contract but is, rather, subject to the condition precedent of [A&P] obtaining . . . corporate executive management committee approval," in addition to "full execution of any necessary legal documents."  (*Id*. at 65.)  Had there been "no additional facts but the parties' entry into the [July 25, 2006] letter," the bankruptcy court would have "conclude[d] that in fact the letter [was] not binding on A&P by its express terms and the case law" to which the bankruptcy court cited.  (*Id*. at 66.)

"However . . . after the execution of the July 25, 2006 letter, A&P . . . actually paid percentage rent pursuant to the formula in that letter . . . for the year of 2007."  (*Id*.)  The Parties

had also "acknowledge[d] that internally A&P prepared paperwork following its form for internal recognition of an amendment of a lease, acknowledging . . . that the lease had been amended to reflect the new percentage rent calculation as per the [July 25, 2006 letter]."  (*Id.*) The Bankruptcy Court found that MBB had correctly argued that "on those undisputed facts . . . even though . . . the condition precedent had not occurred, A&P had ratified the agreement set forth in the [July 25, 2006] letter.  Pennsylvania recognizes the doctrine of ratification . . . and . . . but for one fact . . . it would apply here."  (*Id*. at 67.)

According to the Bankruptcy Court, that one fact made all the difference.  "A&P's second argument"—"that there was literally no consideration for A&P's agreements set forth in the July 2006 letter"—"would negate that ratification."  (*Id*. at 69.)  A&P's contention was that "the letter set forth the landlord's agreement in every respect to do things that the landlord had already agreed to do in the lease as it existed immediately before the parties signed the [July 25, 2006] agreement."  (*Id*.)  Because it is "well recognized under Pennsylvania law that where a legal obligation exists, a cumulative promise to perform it, unless upon new consideration, is a nullity," "the contract is not supported by any consideration and is void ab initio."  (*Id*.)  If that were the case, "then there would be no agreement to ratify here . . . ."  (*Id*. at 69.)  The Bankruptcy Court closed:

> I have carefully reviewed the lease as it existed immediately before the parties entered into the July 25, 2006 letter, and I conclude that in fact all of the consideration that A&P received from the landlord under that letter was already owed by the landlord pursuant to the lease; i.e., the landlord did not provide anything of value to A&P and did not give up or suffer to its detriment anything . . . . Consequently, I conclude the absence of any consideration here at all does in fact render void the ratified July 25, 2006 letter agreement and, consequently, that MBB does not have a right to the debtor's performance under that agreement.

(*Id*. at 69–70, 78.)

15

After the Bankruptcy Court requested and the Parties submitted supplemental briefing, the Bankruptcy Court affirmed its Preliminary Ruling in an Order dated April 5, 2013. (*See* Order Granting Debtors' Mot. for Summ. J. (Dkt. No. 4177), *In re the Great Atlantic & Pacific Tea Company* (Apr. 5, 2013).) On May 30, 2013, MBB filed a Notice of Appeal from the Bankruptcy Court's Order and a Designation of Bankruptcy Record on Appeal with this Court. (*See* Dkt. Nos. 1–2.) A&P filed a Counter Designation of Bankruptcy Record on Appeal the same day. (*See* Dkt. No. 3.) MBB filed its Brief on June 24, 2013; A&P filed its Brief on July 19, 2013; and MBB filed its Reply Brief on August 2, 2013. (*See* Dkt. Nos. 8, 12, 13.)

## II. Discussion

On appeal, MBB argues that the Bankruptcy Court erred as a matter of law in granting A&P's motion for summary judgment for the following reasons: (1) the July 25, 2006 letter agreement is enforceable because it was supported by consideration; and (2) the July 25, 2006 letter agreement was approved, ratified, and confirmed by A&P's performance. (Appellant's Br. in Supp. of Its Appeal of Order Entered in Debtor's Chapter 11 Bankruptcy ("Appellant's Br.") 11–22.)

### A.  Standard of Review

Under Federal Rule of Bankruptcy Procedure 8013, when a district court reviews a final order of a bankruptcy court on appeal, "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous." Fed. R. Bankr. P. 8013; *see also Morgan Olson L.L.C. v. Frederico* (*In re Grumman Olson Indus., Inc.*), 467 B.R. 694, 699 (S.D.N.Y. 2012) (same). "A bankruptcy court's conclusions of law, by contrast, are reviewed de novo." *ACC Bondholder Grp. v. Adelphia Commc'ns Corp.* (*In re Adelphia Commc'ns Corp.*), 367 B.R. 84, 90–91 (S.D.N.Y. 2007). Here, the Court is called upon to review a bankruptcy

16

court's ruling on cross-motions for summary judgment. Under Federal Rule of Bankruptcy

Procedure 7056, Federal Rule of Civil Procedure 56 "applies to [such] adversary proceedings."

Fed. R. Bankr. P. 7056; *see also In re Dana Corp.*, 574 F.3d 129, 146–47 (2d Cir. 2009) (same).

Under Rule 56, a court "shall grant summary judgment if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a); *see also Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir.

2013). It is the movant's burden to show that no genuine factual dispute exists, *see Vermont*

*Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004), but if the movant

carries that burden, "a limited burden of production shifts to the nonmovant, who must

demonstrate more than some metaphysical doubt as to the material facts, and come forward with

specific facts showing that there is a genuine issue for trial." *Roistacher v. Bondi*, No. 11-CV-

8200, 2014 WL 594176, at *4 (S.D.N.Y. Feb. 10, 2014) (internal quotation marks omitted); *see*

*also Stoffan v. S. New England Tel. Co.*, No. 11-CV-1630, 2014 WL 982968, at *6 (D. Conn.

Mar. 13, 2014) (same).

 In reviewing a motion for summary judgment, a court "must resolve all ambiguities and

draw all reasonable inferences in the non-movant's favor." *Vermont Teddy Bear*, 373 F.3d at

244. However, any inferences drawn in the nonmovant's favor "must be supported by the

evidence," and "mere speculation and conjecture is insufficient to defeat [the] motion . . . ."

*Stern v. Trs. of Columbia Univ. in City of New York*, 131 F.3d 305, 315 (2d Cir. 1997) (internal

quotation marks omitted). The existence of a "mere scintilla of evidence in support of

nonmovant's position" is similarly insufficient, *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d

79, 84 (2d Cir. 2004), as is "reliance upon conclusory statements or mere allegations," *Davis v.*

*New York*, 316 F.3d 93, 100 (2d Cir. 2002); instead, there must be "evidence on which a jury could reasonably find for the nonmovant." *Powell*, 364 F.3d at 84.

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B); *see also Morris v. City of New York*, No. 12-CV-3959, 2013 WL 5781672, at *3 (E.D.N.Y. Oct. 28, 2013) (same). A court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3); *see also Chevron Corp. v. Donziger*, No. 11-CV-0691, 2013 WL 1975439, at *2 (S.D.N.Y. May 14, 2013).

### B.  Consideration for the July 25, 2006 Letter Agreement

MBB argues that the bankruptcy court "erred in determining that the July 25, 2006 Letter Agreement is not supported by consideration," as "[t]he record clearly shows that . . . (a) [MBB] consented to [A&P] making exterior changes to [A&P's] Store to allow signage and direct access for [A&P's] planned sub-tenants to the Shopping Center's parking areas, creating direct competition with [MBB] and an 'economic detriment' to [MBB]," and that "(b) [MBB] consented to [A&P] further downsizing [A&P's] Store which would result in a reduction of rental income due to the Percentage Rent component added by the Fourth Amendment." (Appellant's Br. 1.)  Before addressing MBB's consideration arguments, it will be useful to briefly survey the governing Pennsylvania law on two relevant subjects: (1) contractual consideration; and (2) the parol evidence rule.[2]

─────────────────────

[2] As noted above, the Lease's Article 35 mandated that the rights and obligations of the Parties under the Lease were to be interpreted and construed in accordance with Pennsylvania

1.  Contractual Consideration

Pennsylvania courts "will find [an] agreement enforceable as a contract when the parties to it 1) reach a mutual understanding, 2) exchange consideration, and 3) delineate the terms of their bargain with sufficient clarity." *MetroClub Condo. Ass'n v. 201-59 N. Eighth St. Assocs., L.P.*, 47 A.3d 137, 145 (Pa. Super. Ct. 2012). "It is axiomatic that consideration is an essential element of an enforceable contract." *Pennsy Supply, Inc. v. Am. Ash Recycling Corp. of Pennsylvania*, 895 A.2d 595, 600 (Pa. Super. Ct. 2006) (citation and internal quotation marks omitted). Consideration consists of "a detriment to the promisee" or "a benefit to the promisor." *Weavertown Transp. Leasing, Inc. v. Moran*, 834 A.2d 1169, 1172 (Pa. Super. Ct. 2003).

But "[i]t is not enough . . . that the promisee has suffered a . . . detriment at the request of the promisor. The detriment incurred must be the quid pro quo, or the price of the promise, and the inducement for which it was made . . . ." *Pennsy Supply*, 895 A.2d at 600 (citation and internal quotation marks omitted). The same holds true for a benefit to a promisor. A benefit that a promisee confers on a promisor is inadequate to support the enforcement of the promisor's promise if the benefit was not bargained for or not given in exchange for the promise, even when the benefit would otherwise be good consideration. *See, e.g., Cardamone v. Univ. of Pittsburgh*, 384 A.2d 1228, 1233 (Pa. Super. Ct. 1978) ("These services were neither rendered nor bargained for in exchange for appellant's promise to pay appellee's medical bills. While forbearance from proceeding with a law suit may constitute good consideration for an agreement, it must be bargained for and given in exchange for the promise made by the promisor." (citation omitted)); *see also Pennsy Supply*, 895 A.2d at 600 ("Consideration must actually be bargained for as the

law.  (Joint Exs., Ex. 9, at 40.)

exchange for the promise.") (quoting *Stelmack v. Glen Alden Coal Co.*, 14 A.2d 127, 129 (Pa. 1940)).

Additionally, a party's promise to perform what it was already legally bound to do is not sufficient consideration to support the existence of an enforceable contract.  *See Chatham Commc'ns, Inc. v. Gen. Press Corp.*, 344 A.2d 837, 840 (Pa. 1975) ("It is axiomatic that the performance of an act which one party is legally bound to render to the other party is not legal consideration."); *Presbyterian Med. Ctr. v. Budd*, 832 A.2d 1066, 1072 (Pa. Super. Ct. 2003) ("Certainly [the promisee's] consideration could not have been its promise to perform what it was already legally bound to do."); *Pennsylvania State Univ. v. Univ. Orthopedics, Ltd.*, 706 A.2d 863, 873 (Pa. Super. Ct. 1998) ("Performance of an act that a person is already obligated to do is not sufficient consideration to support an agreement.") (citation omitted); *Sams v. Sams*, 808 A.2d 206, 211 (Pa. Super. Ct. 2002) ("Where a legal obligation exists, a cumulative promise to perform it, unless upon a new consideration, is a nullity . . . .  [I]f a person gets nothing in return for his promise but that to which he is already legally entitled, the consideration is unreal." (quoting *In re Com. Trust Co. of Pittsburgh*, 54 A.2d 649, 651 (Pa. 1947))).

"Similarly, the surrender of a nonexistent legal right is insufficient consideration."  *Univ. Orthopedics*, 706 A.2d at 873; *see also Crown Coal & Coke Co. v. Powhatan Mid-Vol Coal Sales, L.L.C.*, 929 F. Supp. 2d 460, 470 (W.D. Pa. 2013) (same); *Passodelis v. Penn Mut. Life Ins. Co.*, No. GD99-010263, 2002 WL 34098137 (Pa. Com. Pl. May 12, 2002) (same).  However, "[a] fundamental axiom of contract law is that . . . forbearance of a legal right" that does exist "is valid consideration."  *U.S. Steel Corp. (USX Clairton Works) v. Unemployment Comp. Bd. of Review*, 858 A.2d 91, 105 (Pa. 2004).  Forbearance of a legal right can still be valid consideration even when the existence of that right is doubtful or disputed, so long as the

20

forbearing party has an honest and reasonable belief in its possible validity. *See Crown Coal*, 929 F. Supp. 2d at 470 ("'[I]t is . . . clear that a compromise of a doubtful or disputed claim is proper and that surrender or compromise of a doubtful claim and forbearance to sue thereon is sufficient consideration.'" (internal quotation marks omitted) (quoting *Cohen v. Sabin*, 307 A.2d 845, 849 (Pa. 1973))); *Lombardo v. Gasparini Excavating Co.*, 123 A.2d 663, 665 (Pa. 1956) ("[The Pennsylvania Supreme Court has] adopted the rule . . . that forbearance to assert an invalid claim by one who has not an honest and reasonable belief in its possible validity is not sufficient consideration." (citation and internal quotation marks omitted)); *SKF USA, Inc. v. Workers' Comp. Appeal Bd. (Smalls)*, 714 A.2d 496, 500 (Pa. Commw. Ct. 1998) ("It is . . . well established . . . that the surrender or compromise of a doubtful or disputed claim and forbearance to sue thereon constitute sufficient consideration."); *Crown v. Cole*, 236 A.2d 532, 534 (Pa. Super. Ct. 1967) ("Forbearance to assert an invalid claim, or to interpose an invalid defense to a valid claim, by one who does not have an honest and reasonable belief in its possible validity is not considered sufficient consideration.").

### 2.  The Parol Evidence Rule

The Pennsylvania Supreme Court has explained Pennsylvania's parol evidence rule in the following manner:

> Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement.  All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract . . . and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence.

*Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436 (Pa. 2004) (alteration in original).

"Once a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract." *Id.* at 436–37 (citing *Bardwell v. Willis Co.*, 100 A.2d 102, 104 (Pa. 1953)); *see also McGuire v. Schneider, Inc.*, 534 A.2d 115, 117 (Pa. Super. Ct. 1987) ("Where the parties to an agreement adopt a writing as the final and complete expression of their agreement, . . . evidence of negotiations leading to the formation of the agreement is inadmissible to show an intent at variance with the language of the written agreements.  Alleged prior or contemporaneous oral representations or agreements concerning subjects that are specifically dealt with in the written contract are merged in or superseded by the that contract." (citation omitted)).  Thus, for the parol evidence rule to apply, "there must be a writing that represents the 'entire contract between the parties.'"  *PNC Bank, Nat. Ass'n v. Bluestream Tech., Inc.*, 14 A.3d 831, 841 (Pa. Super. Ct. 2010) (quoting *Gianni v. Russell & Co.*, 126 A. 791, 792 (Pa. 1924)). To determine whether a writing is the parties' entire contract, "the writing must be looked at," and "'if it appears to be a contract complete within itself, couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the parties' engagement, it is conclusively presumed that the writing represents the whole engagement of the parties.'"  *Id*. (alterations omitted) (quoting *Gianni*, 126 A. at 792).

However, an exception to the rule exists "where a term in the parties' contract is ambiguous," in which case "parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances."  *Yocca*, 854 A.2d at 437; *see also Step Plan Servs., Inc., v. Koresko*, 12 A.3d 401, 409–10 (Pa. Super. Ct. 2010) ("The court might consider extrinsic

22

or parol evidence to determine the parties' intent only where the language of the agreement is

ambiguous.") (citation omitted).  "Contractual language is ambiguous 'if it is reasonably

susceptible of different constructions and capable of being understood in more than one sense.'"

*E.R. Linde Const. Corp. v. Goodwin*, 68 A.3d 346, 349–50 (Pa. Super. Ct. 2013) (quoting

*Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986)).  Critically, a mechanism that

courts in other contexts have termed "bootstrapping" is barred; "[t]he ambiguity must appear on

the face of the agreement and not be created by the parol evidence which is offered."  *Com.,*

*Dep't of Transp. v. Brozzetti*, 684 A.2d 658, 663 (Pa. Commw. Ct. 1996).  It is "well settled" that

"[t]he court, as a matter of law, determines the existence of an ambiguity and interprets the

contract," while "the resolution of conflicting parol evidence relevant to what the parties

intended by the ambiguous provision is for the trier of fact."  *Missett v. Hub Int'l Pennsylvania,*

*LLC*, 6 A.3d 530, 541 (Pa. Super. Ct. 2010).

      There is limited—though ancient—Pennsylvania case law that might tend to suggest that

there is another exception to the parol evidence rule, under which parol evidence may be

admitted to show consideration other than that expressed in a written instrument.  The most

recent case that the Court was able to locate that supports the existence of such an exception is *In*

*re Cridge's Estate*, 137 A. 455 (Pa. 1927), in which the Pennsylvania Supreme Court observed:

> [R]ecent decisions have . . . [held] that if the matter proposed to be shown by parol
> is the subject of a covenant in the agreement, which is complete, such evidence to
> alter the terms cannot be received, and we have no intention of weakening [that]
> position . . . .  A distinction has, however, been drawn in the decisions, where the
> effort is made to show by parol the true purchase price.  The amount of the
> consideration in a contract, whether large or small, does not usually affect the
> covenants of the parties, *and therefore the fact that there was some other or different*
> *consideration than that expressed in the writing may be orally shown*, the
> consideration mentioned being held only presumptive evidence that it is the real one.
> *Thus it has been held permissible to prove that the sum named was more than that*
> *stipulated for in the deed, and that additional amounts were to be paid, that other*

> *obligations not named have been assumed*, or that there was no money consideration,
> though one is named, the transaction constituting a mere gift. . . .

*Id*. at 458 (emphasis added) (citations and internal quotation marks omitted).

However, the Pennsylvania Supreme Court appears to have rejected this exception in a
more recent case, *Jordan v. Sun Life Assurance Co. of Canada*, 77 A.2d 631 (Pa. 1951).  To
illustrate the point, the facts of that case are worth briefly recounting.  There, plaintiff was
employed as manager of defendant's Philadelphia office under an employment contract, the
terms of which provided that he would be paid a salary based on the amount of business handled
through his office, that he would receive a bonus based on the amount of new business for the
year, and that he would receive a pension upon reaching 60.  *Id*. at 632.  However, after being
called into a meeting "with several of defendant's officers and confronted with notes payable to
various banks . . . on which plaintiff was either the primary obligor or was acting as surety for
his agents," plaintiff offered and defendant accepted plaintiff's letter of resignation, which stated
in part: "It is my desire that all contracts or supplemental contracts of any nature whatsoever
now existing between myself and your company shall be cancelled as of this date."  *Id*.

Plaintiff later alleged that defendant contemporaneously and orally agreed to settle the
outstanding debts and also to pay him a pension on the same basis as if he had become totally
incapacitated in exchange for his resignation.  *Id*.  "After [plaintiff's] written resignation was
introduced into evidence a motion to strike [plaintiff's] oral testimony [on the basis of the parol
evidence rule] was granted," which ruling plaintiff "contend[ed] [was] erroneous."  *Id*.  Plaintiff
argued that "parol evidence is admissible to show that the consideration is different than that
expressed in the writing."  *Id*. at 633.  Citing *In re Cridge's Estate*, the court disagreed:

> The rule thus stated does not accurately portray the law of Pennsylvania. Parol
> evidence of the consideration is only admissible where its admission will not affect

24

or destroy the covenants of the writing.  Here, plaintiff is attempting to introduce parol evidence which would completely negate the express terms of the writing and this he cannot do.  This case falls squarely within the rule . . . that where a writing and an alleged oral agreement pertain to the same subject matter and are so interrelated that both would be executed at the same time and in the same contract, the parol evidence rule excludes evidence of the purported oral agreement in the absence of a showing of fraud, accident or mistake.  Plaintiff has neither alleged nor proved fraud, accident or mistake.  *His efforts have been directed solely to varying the terms of the writing by seeking to show additional promises made by defendant in return for plaintiff's resignation.*  Since such promises, had they been made, would normally have been integrated in the writing, they cannot be proven by parol.

*Id*. (citation omitted) (emphasis added).

Thus, the court was squarely presented with a situation to which the exception from *In re Cridge's Estate* presumably should have applied—a party's attempt to demonstrate that "there was some other or different consideration than that expressed in the writing," and that "other obligations not named [in the contract had] been assumed."  And yet, fully aware of and in fact even citing to *In re Cridge's Estate*, the court declined to apply it.  As a result, the Court finds that no such exception currently exists under Pennsylvania law, and that the parol evidence rule applies with full force to attempts to show consideration other than that expressed in a written instrument.  *See Crompton-Richmond Co., Inc.-Factors v. Smith*, 253 F. Supp. 980, 984 (E.D. Pa. 1966) (rejecting party's efforts to introduce parol evidence "in the guise of showing a failure of consideration") (citing, *inter alia*, *Jordan*, 77 A.2d at 631), *aff'd sub nom. Crompton-Richmond Co., Inc. Factors v. Smith*, 392 F.2d 577 (3d Cir. 1967); *cf. Emperee v. Meyers*, 269 A.2d 731, 733 (Pa. 1970) (holding that the parol evidence rule barred the appellant from contending that the appellee had orally agreed to manage the appellant's business for an

extended period of time in exchange for a judgment note when such agreement was not included in the note's written terms).[3]

### 3.  MBB's Consent to A&P's Exterior Changes

MBB correctly notes that Article 15 of the Lease provided that, "in the event [that A&P] wishe[d] to make an Alteration to the exterior of [A&P's] building (other than to sign faces)," it was required to "first obtain [MBB's] consent thereto, which consent [was] not [to] be unreasonably withheld, conditioned or delayed."  (Appellant's Br. 11; Joint Exs., Ex. 9, at 11.) MBB claims that A&P "entered into the July 25, 2006 Letter Agreement with the intent of subleasing a portion of [A&P's] Store consisting of approximately 11,000 square feet," and that "there was no way to access said 11,000 square feet except through [A&P's] store." (Appellant's Br. 12.)  A&P therefore "requested that [MBB] authorize the creation of store fronts along portions of the 11,000 square feet that [A&P] intended to sublet or assign," in order to "remedy [A&P's] dilemma and make the 11,000 square feet more attractive to prospective sub-tenants . . . ."  (*Id.*)  Although "[a]llowing [A&P] to alter the exterior of [its] Store to construct store fronts and exterior doorways [would] create[] direct competition with [MBB's]

---

[3]  The Court's finding in this respect should not be construed as an expression of disagreement with a different, though related, exception to the parol evidence rule under Pennsylvania law: that parol evidence is admissible to prove *failure* of the consideration mentioned in a written instrument.  *See Smilow v. Dickerson*, 54 A.2d 883, 890 (Pa. 1947) ("It has long been the law of this Commonwealth that parol evidence is admissible to prove failure of the consideration mentioned in a written instrument.") (citation omitted); *see also Guar. Trust Co. Of N.Y. v. Williamsport Wire Rope Co.*, 222 F.2d 416, 420 (3d Cir. 1955) ("Parol evidence is also admissible to establish the failure of consideration.").  Though most of the cases supporting the existence of this exception are almost as old as *In re Cridge's Estate* and *Jordan*, the Court is unaware of any more recent case that calls their continued vitality into question.  It may be that parol evidence showing failure of consideration is admissible while parol evidence showing other or different consideration is not because the former "strikes to the very heart of the contractual relationship . . . ."  *Caplan v. Saltzman*, 180 A.2d 240, 243 (Pa. 1962) (Cohen, J. dissenting).

core business," which MBB describes as "leasing store fronts in the Shopping Center [in which A&P's building is located] with direct access to the Shopping Center's parking areas and exterior visibility and signage," MBB "[n]evertheless . . . agreed that it would consent to Tenant's proposed alterations to the exterior of Tenant's Store . . . ." (*Id.* at 13.)

In the context of the governing case law, MBB's argument can be fairly summarized as follows. MBB had a contractual right pursuant to Article 15 of the Lease to withhold its consent to any exterior changes that A&P wanted to make, so long as its withholding of such consent was not "unreasonable." By authorizing A&P to create store fronts, MBB did not exercise a legal right that existed, or the existence of which was at the very least doubtful or disputed, and in the existence of which MBB had an honest and reasonable belief. Thus, MBB's authorization of A&P's creation of store fronts constituted valid consideration, which means that the July 25, 2006 letter agreement cannot have been void ab initio for lack of consideration, as the Bankruptcy Court held.

MBB made a similar argument before the Bankruptcy Court, (*see* Debtor Appellee's Br. in Supp. of Bankruptcy Ct.'s Order Resolving Resolution of Cure Objection for Lease No. 154, Located at 8920-60 Frankford Avenue, Philadelphia, Pennsylvania ("Appellee's Br.") 19–20), which argument the Bankruptcy Court rejected:

> The only factual dispute as to the work to be done in connection with the shrinkage of the A&P space contemplated by the [July 25, 2006] letter is a statement, without any record support by MBB, that there were, in fact, changes to the outside or the outer structure of the store beyond the signage . . . . Again, it does not have a citation to the record, and I believe the record does not actually describe any outer structural changes. MBB argues that one can certainly draw the inference that to permit subletting, there would have to at least be an outer structural change for a door for the subtenant, which inference I would have to take in its favor in its defense of A&P's summary judgment motion. *However, the July 2006 letter says nothing about consenting to such an exterior modification . . . .* It appears clear to me, therefore, that if, in fact, A&P ever did

get a subtenant . . . and had to provide for an additional door for the subtenant, the landlord would still have its right to insist on consent, not to be unreasonably withheld, under Article 15 of the lease.  That is, it did not give up that right in the July 2006 letter, and, therefore, it was not providing consideration on that ground . . . .

(Hr'g Tr. 74–75 (emphasis added).)

Before turning to the somewhat more nuanced arguments that MBB makes on appeal, the Court first notes that neither Party has argued that the July 25, 2006 letter agreement and the July 21, 2006 email from Willner to Sides that the letter agreement specifically incorporates by reference were not "writing[s] that represent[ed] the entire contract between the parties."  *PNC Bank*, 14 A.3d at 841 (citation omitted).  Nor has either Party "averr[ed]" "fraud, accident or mistake . . . ."  *Yocca*, 854 A.2d at 436.  After reviewing the documents in question, the Court is satisfied that there is nothing to suggest that the Parties did not intend for those documents to constitute the entirety of their agreement.  In fact, the opening lines of the July 25, 2006 letter agreement describe it as a "follow up to our recent meeting, e-mails and telephone conversations regarding A&P/Food Basics desire to erect a demising wall in order to allow the downsizing of the sales area at the above reference location"—not a merger clause per se, but language that could be taken as indicating an intent to subsume all such prior discussions on the subject into the letter agreement's explicit text.  The Court is also satisfied that there is no evidence that fraud, accident, or mistake played any role in the negotiation process.  Therefore, the parol evidence rule applies to MBB's appellate arguments.

The Court begins its evaluation of MBB's argument by looking to the "particular parts of materials in the record" to which MBB is obligated to cite in support of its argument, as "[a] party asserting that a fact . . . is genuinely disputed . . . ."  Fed. R. Civ. P. 56(c); *see also Meredith Corp. v. SESAC LLC*, — F. Supp. 2d —, 2014 WL 812795, at *11 (S.D.N.Y. Mar. 3,

2014) ("To survive a summary judgment motion, plaintiffs must establish a genuine issue of fact

by citing to particular parts of materials in the record." (internal quotation marks omitted)).  For

the proposition that "[A&P] requested that [MBB] authorize the creation of store fronts along

portions of the 11,000 square feet that [A&P] intended to sublet or assign," and that MBB

"agreed that it would consent to [A&P's] proposed alterations to the exterior of [A&P's] Store,"

MBB cites to three sources: Willner's June 21, 2006 email to Sides; the July 25, 2006 letter

agreement; and Willner's deposition testimony.  (Appellant's Br. 12–13; *see also* Appellant's

Reply Br. in Support of Its Appeal of Order Entered in Debtor's Chapter 11 Bankruptcy

("Appellant's Reply Br.") 2, 5.)

As to the first two sources, MBB argues that "[p]ortions of the June 21, 2006 Email are

incorporated in the July 25, 2006 Letter Agreement by specific reference," and that "those

provisions require that in exchange for [MBB's] consent, which [MBB] could reasonably

withhold, [A&P] was to engage in efforts for approval of additional store fronts . . . ."

(Appellant's Br. 13–14.)  It is helpful to reproduce the "portions" and "provisions" of the two

documents to which MBB refers in full.  From Willner's June 21, 2006 email to Sides:

> The zoning approval for the site provides approval for a supermarket and a certain
> number of other retail stores (I think 5).  Prior to dividing your space, you need to
> obtain zoning approval for more retail uses at the site.  I think we should obtain
> approval for up to 10 stores at the site, excluding the Hollywood Video building.

(Joint Exs., Ex. 16.)  From the July 25, 2006 letter agreement:

> Addressing your other concerns, simultaneously as the remodel is being performed,
> A&P/Food Basics will go to the City of Philadelphia for a zoning application and
> will use good faith efforts to attempt to obtain approval for additional retail spaces
> as outlined in your June 21, 2006 e-mail.

(Joint Exs., Ex. 15.)

After reading these passages, it becomes clear that MBB's argument subtly changes from the straightforward, "A&P requested and MBB provided its authorization for A&P's creation of store fronts," to something along the lines of, "MBB requested that A&P obtain zoning approval for additional retail spaces, which means that MBB must have been implicitly consenting to any exterior changes that A&P would need to make in order to sublease those additional retail spaces to subtenants, including the creation of store fronts." MBB thus seeks to convert A&P's promise to "use good faith efforts to attempt to obtain approval for additional retail spaces"—something that, by the plain language of the letter agreement, A&P appeared to be *giving to MBB*—into MBB's consent to any exterior changes that A&P would need to make—something that MBB was *giving to A&P*, and which therefore constituted valid consideration for A&P's promise to pay new percentage rent terms. Put more charitably, MBB essentially argues that the language of the June 21, 2006 email and the July 25, 2006 letter agreement that it cites shows that MBB was consenting to the entirety of A&P's remodeling plans—to everything that A&P thought it needed permission for at the time, as well as to what A&P would need permission for in the future.

Given this record, the Court finds no fault with the Bankruptcy Court's ruling that "if, in fact, A&P ever did get a subtenant . . . and had to provide for an additional door . . . the landlord would still have its right to insist on consent . . . ." (Hr'g Tr. 74.) There is simply nothing whatsoever in either provision that discusses exterior modifications to the building, let alone changes as specific as the creation of additional store fronts. In the July 21, 2006 email from Willner to Sides, Willner is communicating that the zoning approval for the site at the time permitted occupancy by five other retail stores in addition to the supermarket, but that in his opinion, A&P should obtain approval for up to five more prior to dividing its space by

30

constructing the demising wall.  In the July 25, 2006 letter agreement, A&P is agreeing to use good faith efforts to apply for the zoning approval that Willner previously described.  To infer from this exchange that Willner had somehow waived his contractual right to insist on consent to exterior modifications that A&P might have had to make if and when it secured subtenants would not be reasonable.

MBB also cites to a segment of Willner's deposition testimony in support of its argument.  However, because the Court finds that the provisions of the letter agreement and related email upon which MBB relies are not ambiguous, the Court is barred from considering parol evidence like Willner's testimony in determining the meaning of those provisions.  *See Krauss v. M. L. Claster & Sons, Inc.*, 254 A.2d 1, 2 n.1 (Pa. 1969) ("Appellant . . . has argued that the court below erred in not allowing appellant to testify as to what his understanding of the meaning of the covenant was.  We agree with the court below that the contract is by its terms completely unambiguous, and thus the court properly excluded appellant's testimony . . . .").  But even if the Court were to consider the cited segment of Willner's deposition testimony, its conclusion would be the same.  The segment is reproduced below in its entirety:

> Q: Agreed.  They're not permitted according to Paragraph 15 to impair the structural integrity of the demised premises.  I don't think you're arguing the proposed changes or the actual changes impaired the structural integrity, correct?
>
> A.  They haven't.  The structural changes would need to be made in order to put another tenant in the space that they were downsizing from.

(Joint Exs., Ex. 5, at 112:8–18.)

Nothing in this testimony supports the contentious aspects of MBB's position.  Willner was merely communicating his belief that, as of the date of the deposition, A&P had not yet made any changes to the building that had impaired its structural integrity, but that the changes

that A&P would have to make to allow subtenants to occupy the excess square footage that the Food Basics store was not using would have been "structural" in nature.  But he does not state or even suggest that A&P requested or that MBB authorized exterior changes to the building generally or the creation of store fronts specifically, or that such request and authorization occurred within the context of the negotiations leading up to the July 25, 2006 letter agreement, or that they were reflected in its terms.

Because the Court finds that the July 25, 2006 letter agreement and the June 21, 2006 email from Willner to Sides that it incorporated by reference formed the entirety of the agreement between the parties, and because the provisions of those documents to which MBB cites do not contain any language that could even ambiguously represent MBB's authorization for A&P to make structural changes in its building, such consent cannot constitute consideration for the new percentage rent terms contained in the July 25, 2006 letter agreement.

### 4.  MBB's Consent to A&P's Further Downsizing of A&P's Store

MBB's second claim as to why the Bankruptcy Court erred in finding that the July 25, 2006 letter agreement was void ab initio for lack of consideration is that by "agree[ing] to a reduction of the Fixed Rent and inclusion of a Percentage Rent provision in executing the Fourth Amendment," MBB and A&P "intended that [A&P's] Store operate on the entire square footage agreed upon by the parties," as "[a]ny reduction of the square footage of [A&P's] Store would lead to a reduction in the Percentage Rent."  (Appellant's Br. 15.)  Therefore, "[A&P's] efforts to further downsize [its] Store required [MBB's] approval . . . .  Accordingly, [MBB's] approval for [A&P] to further downsize [its] Store constitutes consideration by [MBB] . . . ."  (*Id*. at 17.)

Perhaps in recognition that there are no express terms in the Fourth Amendment that obligate A&P to operate its store on the entire 48,131 square feet of its building, MBB does not

seek to rely on the Amendment's explicit language.  Rather, MBB argues that the Fourth

Amendment's addition of percentage-rent terms to the Lease "imposed an equitable obligation of

fair dealing on the parties for both of their benefits."  (*Id*. at 15.)  In support of this argument,

MBB quotes *Agrecycle, Inc. v. City of Pittsburgh*, 783 A.2d 863 (Pa. Commw. Ct. 2001):

> In the absence of an express provision, the law will imply an agreement by the
> parties to a contract to do and perform those things that according to reason and
> justice they should do in order to carry out the purpose of the contract and to refrain
> from doing anything that would destroy or injure the other party's right to receive
> the fruits of the contract.

(Appellant's Br. 15 (quoting *Agrecycle*, 783 A.2d at 868).)  MBB also cites to *Kaplan v.*

*Cablevision of Pennsylvania, Inc.*, 671 A.2d 716 (Pa. Super. Ct. 1996), for the notion that "[t]he

doctrine may be applied to prevent injustice where it is abundantly clear that the parties intended

to be bound by the terms sought to be implied."  (Appellant's Br. 15 (citing *Kaplan*, 671 A.2d at

720).)

   MBB's reliance on *Agrecycle* is misplaced.  In fact, in circumstances strikingly similar to

those presented by this action, the court in *Agrecycle* held that the equitable obligation of fair

dealing in which MBB grounds its argument did not apply.  There, the City of Pittsburgh invited

bids from private contractors for composting services consisting of retrieving compostable

materials at the drop-off facilities operated by the City, composting those materials, and selling

them to third parties.  *Agrecycle*, 783 A.2d at 865.  The bid specifications stated that, based on its

activities in preceding years, the City expected to deliver 20,000–30,000 tons of compostable

materials annually to a successful bidder.  *Id*. at 865–66.  But the City also warned that "the

exact quantity or quality of the compostable materials for [the] contract [could] not be

guaranteed," and that "[u]nder no circumstances [were those] numbers warranted or guaranteed

by the City."  *Id*. at 866.  Agrecycle won the bid, and thereafter entered into an agreement with

33

the City that incorporated the terms of the bid specifications.  *Id*.  The agreement also contained

an additional disclaimer, which stated that "the City of Pittsburgh [did] not in any way guarantee

or imply the amount of work or service which [might have been] required to be performed under

[the] agreement, it being understood that needs [could not] be forecast."  *Id*.

When the City delivered significantly less compostable material than it had

estimated—an average of approximately 2,293 pounds per year over the first three years of the

agreement—Agrecycle sued, claiming breach of contract and breach of the implied covenant of

good faith and fair dealing.  *Id*.  Among other charges, Agrecycle "alleged that the City failed to

deliver the volumes of the compostable materials as represented in the Bid Specifications . . . ."

*Id*.  After a jury found for the City at trial, Agrecycle "challenge[d] the trial court's refusal to

charge the jury on the implied covenant of good faith and fair dealing . . . using the exact

language contained in its Suggested Points for Charge" on appeal.  *Id.* at 867.  The court upheld

the propriety of the jury charge; but more importantly, it held that the implied covenant of good

faith and fair dealing was inapplicable to the case in the first instance:

> [T]he Agreement expressly and unambiguously provided that the City did not
> warrant or guarantee the quantity or quality of the compostable materials to be
> delivered to Agrecycle.  The Bid Specifications stated that . . . the City would not
> guarantee or warrant the actual quantity or quality of those materials under any
> circumstances . . . .  The fundamental rule in construing a contract is to ascertain and
> give effect to the intention of the parties.  The intention of the parties must be
> ascertained from the document itself, if its terms are clear and ambiguous.  To
> impose the duty on the City to deliver the amount of the compostable materials
> estimated in the Bid Specifications . . . would be in total disregard of the
> unambiguous language in the Agreement rejecting such duty and would result in
> defeating the intention of the parties expressed in the Agreement.  The City
> specifically contracted to avoid such duty in the Agreement.  Hence, the implied
> covenant of good faith and fair dealing relied on by Agrecycle is inapplicable to the
> facts in this matter.

*Id*. at 868 (citations omitted).

Here, the core of MBB's argument is that A&P was obligated to operate its store on its building's entire square footage because "[a]ny reduction of the square footage of [A&P's] store would lead to a reduction in the Percentage Rent." (Appellant's Br. 15.) "[A&P's] further downsizing of [its] Store after the execution of the Fourth Amendment results in less square footage from which products can be sold by [A&P] and harms [MBB's] ability to receive the fruits of the parties' agreement"—that is, a percentage of the annual sales that A&P made from the Demised Premises. (*Id.* at 16.) In other words, MBB is essentially arguing that the Fourth Amendment entitled it to receive a certain amount of percentage rent.

MBB's argument, however, is undone by the language of the Fourth Amendment. The Fourth Amendment's Exhibit L, the same exhibit that introduced percentage-rent terms to the Lease, explicitly provides: "[A&P] makes no representation or warranty that the business in the Demised Premises will amount to any specified volume." (Joint Exs., Ex. 13, at Ex. L.) Just as in *Agrecycle*, the imposition of a duty on A&P to operate its store on its building's entire square footage in order to protect MBB's percentage-rent interests—which duty the Court would have to enforce in order to find that MBB's consent to A&P's downsizing constituted valid consideration for the July 25, 2006 letter agreement—would "be in total disregard of the unambiguous language in the [Fourth Amendment] rejecting such duty and would result in defeating the intention of the parties expressed in the Agreement," as "[A&P] specifically contracted to avoid such duty in the [Fourth Amendment]." *Agrecycle*, 784 A.2d at 868. As a result, "the implied covenant of good faith and fair dealing relied on by [MBB] is inapplicable to the facts of this matter." *Id*.

The Court's holding is also strengthened by the incompatibility of MBB's position with the Fourth Amendment's Article 4, which states that, "[n]otwithstanding anything to the contrary

35

contained in this Lease, subsequent to Tenant's opening of the Demised Premises for business as a fully stocked and operational supermarket, Tenant shall not be obligated to conduct or to remain open for the conduct of any business in the Demised Premises . . . ." (Joint Exs., Ex. 13, at 4.) The Court's enforcement of an *implicit* obligation contained in the Fourth Amendment requiring A&P to operate its store on *all* of the building's square footage would thus prevent A&P from exercising an *explicit* right contained in the Fourth Amendment to operate its store on *none* of the building's square footage.

Lastly, MBB's position also conflicts with a provision from the original Lease. Article 20, which covered assignment and subletting, and which the Fourth Amendment did not alter, stated that, "[p]rovided that the use does not violate the terms and provisions of" the Lease's article governing use and occupancy, A&P was entitled to "sublet all or any part of the Demised Premises, or license the use of any portion thereof or assign this Lease . . . ." (Joint Exs., Ex. 9, at 25.) The enforcement of the implicit obligation that MBB argues is inherent in the Fourth Amendment would disallow A&P from subleasing "all or any part" of the Demised Premises, and would therefore contradict not only the express terms of the Fourth Amendment itself, but the express terms of the original Lease as well.[4]

---

[4] The Fourth Amendment's Article 10, titled "Conflict," states that, "[i]n the event of any conflict between the terms of this Amendment and the terms of the Lease, the terms of this Amendment shall supersede, govern and control." (Joint Exs., Ex. 13, at 9.) However, the issue is not that one of the Fourth Amendment's terms conflicts with the Lease's Article 20; the issue is that what MBB argues is an equitable obligation of fair dealing implicit in the Fourth Amendment conflicts with the Lease's Article 20. By its own language, the Fourth Amendment's Article 10 would not apply to such an obligation, which is not a term.

C.  Ratification of the July 25, 2006 Letter Agreement

MBB argues that the July 25, 2006 letter agreement was "ratified and confirmed" by

A&P's performance thereunder, as A&P "paid the Percentage Rent due under the July 25, 2006

Letter Agreement; it downsized [its] Store; and it attempted to obtain approval for additional

signage."  (Appellant's Br. 19.)  MBB also argues that "A&P admits that [its] Real Estate

Committee approved the July 25, 2006 Letter Agreement and authorized the issuance of a TX-

Notification to implement [its] terms . . . ."—which is to say, that the submission of an executed

letter to A&P's Corporate Executive Management Committee "for final approval and full

execution of any necessary legal documents by all parties," the "condition precedent" required

by the letter agreement's terms to give it binding effect, "was satisfied," rendering A&P's

ratification of the letter agreement unnecessary.  (Appellant's Br. 20.)

Under Pennsylvania law, "a party who executed a contract under duress," who then

"accepts the benefit flowing from it, or remains silent, or acquiesces in [it] for any considerable

length of time after the party has the opportunity to annul or avoid [it]," ratifies the contract,

such that it becomes enforceable where it otherwise would not have been.  *Sams v. Sams*, 808

A.2d 206, 212 (Pa. Super. Ct. 2002) (citation omitted).  The doctrine of ratification applies

equally to contracts procured through fraud.  *See Winters v. Inv. Sav. Plan for Emps. of Knight-

Ridder, Inc.*, 174 F. Supp. 2d 259, 263 (E.D. Pa. 2001) ("Failure to tender back the consideration

after discovery of the alleged fraud constitutes an affirmance of the contract." (citing *Nocito v.

Lanuitti*, 167 A.2d 262, 263 (Pa. 1961))), *aff'd sub nom. Winters v. Kutrip*, 47 F. App'x 143 (3d

Cir. 2002).

However, "[a] mere ratification cannot, of course, correct any defect in the terms of the

contract.  If it is in its very terms invalid for want of consideration or for any other defect, a mere

37

ratification can add nothing to its binding force." *Garland v. Riebe*, 78 Pa. Super. 567, 572 (Pa. Super. Ct. 1922) (internal quotation marks omitted); *see also Allen v. Holiday Universal*, 249 F.R.D. 166, 172 (E.D. Pa. 2008) ("It is indisputable that a *voidable* contract may be ratified, while a *void* contract may not."); *ECC Ret. Vill. v. Dep't of Pub. Welfare*, 629 A.2d 1046, 1049 (Pa. Commw. Ct. 1993) (agreeing with the respondent's argument that certain "agreements were void . . . for lack of consideration"); *Yannuzzi v. Com., State Horse Racing Comm'n*, 390 A.2d 331, 332 (Pa. Commw. Ct. 1978) ("The term 'void' is properly applied to those contracts that are of no effect whatsoever, whereas a 'voidable' contract can be cured by the act or confirmation of one of the parties." (citation omitted)); *FDA Packaging, Inc. v. Advance Pers. Staffing, Inc.*, 2005 Pa. Dist. & Cnty. Dec. LEXIS 31, at *12–14 (Pa. Com. Pl. June 1, 2005) ("A voidable contract is one in which a party has the power . . . either to disaffirm the agreement . . . or to ratify the agreement. . . .  In contrast, a declaration that a contract is void nullifies all aspects of the agreement, . . . giving neither party the power to rectify or disaffirm its provisions."); *Wash. Sewer Co. v. Warrington Twp.*, 29 Pa. D. & C.3d 66, 70 (Pa. Com. Pl. 1982) (suggesting that a contract would have been "void" if it had been unsupported by any consideration), *aff'd sub nom. Warrington Sewer Co. v. Warrington Twp.*, 474 A.2d 435 (Pa. Commw. Ct. 1984).

Thus, because the Court rejected MBB's argument that the Bankruptcy Court erred in holding that the July 25, 2006 letter agreement was void ab initio for lack of consideration, it need not reach the question of whether A&P's conduct subsequent to the letter agreement's signing ratified it, as the doctrine is wholly inapplicable.  Similarly, the Court need not address MBB's contention that the letter agreement's condition precedent was satisfied.  MBB's argument in this regard is a response to an argument that A&P has made, that the letter agreement "contains an express condition precedent requiring that A&P's Corporate Executive

38

Management Committee approve the proposed amendments, which never occurred," and that as a result, "the duty to perform the contract lays dormant and no damages are due for non-performance." (Appellee's Br. 12 (citation omitted).) As the letter agreement was void ab initio, and was therefore not an enforceable contract, whether its condition precedent was satisfied is irrelevant.

Relatedly, MBB also argues that "[A&P's] claim that it failed to even seek the approval of the July 25, 2006 Letter Agreement [from its Corporate Executive Management Committee] evades the spirit of the bargain and shows an utter lack of diligence by [A&P]," and was a "breach of its duty of good faith." (Appellant's Br. 20.) Therefore, "[d]enying [MBB] its compensation and its rights under the July 25, 2006 Letter Agreement because of [A&P's] action would be unjust and inequitable." (*Id*.) In short, it is an argument as to why the letter agreement's condition precedent should not be enforced to bar MBB from recovering percentage rent. (*See* Appellant's Br. 21-22 ("[A&P's] failure to satisfy condition precedent set forth in the July 25, 2006 Letter Agreement leads to forfeiture by [MBB] since the condition's non-occurrence results in the denial of compensation to [MBB].").)

Just like MBB's contention that the letter agreement was ratified and that its condition precedent actually occurred, this argument is one that the Court need not consider. The letter agreement's percentage-rent provisions are unenforceable not because of the non-occurrence of its condition precedent, but because the letter agreement did not constitute a binding contract in the first place for want of consideration. *See Garland*, 78 Pa. Super. at 572. With no enforceable contract, MBB can have no breach-of-contract claim, and "absent a breach of contract, there is no independent duty of good faith under Pennsylvania law." *Com. v. BASF Corp.*, No. 3127, 2001 WL 1807788, at *13 (Pa. Com. Pl. Mar. 15, 2001); *see also VAI, Inc. v.*

*Miller Energy Res., Inc.*, No. 11-CV-3906, 2013 WL 5842614, at *9 (E.D. Pa. Oct. 31, 2013)

("Because Pennsylvania does not recognize the implied covenant of good faith and fair dealing

as a cause of action independent from a breach of contract claim, summary judgment is granted .

. . ."); *Oates v. Wells Fargo Bank, N.A.*, 880 F. Supp. 2d 620, 628 (E.D. Pa. 2012)

("Pennsylvania does not recognize an independent cause of action for the breach of the implied

duty of good faith and fair dealing."); *Cummings v. Allstate Ins. Co.*, 832 F. Supp. 2d 469,

473–74 (E.D. Pa. 2011) ("[T]here is no implied covenant of good faith and fair dealing claim

separate from a breach of contract claim [under Pennsylvania law]."); *LSI Title Agency, Inc. v.

Evaluation Servs., Inc.*, 951 A.2d 384, 392 (Pa. Super. Ct. 2008) (upholding trial court's

determination that "the claim for breach of the implied covenant of good faith and fair dealing is

subsumed in a breach of contract claim").

### III.  Conclusion

For the reasons given herein, the Order of the Bankruptcy Court is affirmed.  The Clerk

of the Court is respectfully requested to close this case.

SO ORDERED.

Dated:          March 3 , 2014
                White Plains, New York

                                                KENNETH M. KARAS
                                                UNITED STATES DISTRICT JUDGE

40